<u>UNITED STATES DISTRICT COURT</u>
<u>SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION</u>

| | | |
|---|---|---|
| AMERICAN CENTURY PROPRIETARY | ) | |
| HOLDINGS, INC., a Delaware corporation, | ) | |
| | ) | Case No. H-05-2179 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Gilmore |
| | ) | |
| AMERICAN CENTURY CASUALTY | ) | |
| COMPANY, a Texas corporation, and | ) | |
| AMERICAN CENTURY CLAIMS SERVICE, | ) | |
| INC., a Texas corporation, | ) | |
| | ) | |
| Defendants. | ) | |

<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS'</u>
<u>LIABILITY ON CLAIMS I, II, IV and V AND BRIEF IN SUPPORT</u>

TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INDEX OF EXHIBITS..................................................................................................... iv

SUMMARY OF THE ARGUMENT .............................................................................. vii

NATURE AND STAGE OF PROCEEDINGS ............................................................... viii

STATEMENT OF UNCONTESTED FACTS ................................................................... 1

    I.   PLAINTIFF AND ITS USE OF "AMERICAN CENTURY" ........................................... 1

    II.  DEFENDANTS AND THEIR USE OF "AMERICAN CENTURY" ............................... 5

    III. ACTUAL CONFUSION ..................................................................................... 8

    IV. THE MARKETPLACE ...................................................................................... 10

AUTHORITY AND ARGUMENT ................................................................................. 11

    V.  SUMMARY JUDGMENT STANDARD......................................................... 11

    VI. SUMMARY JUDGMENT PROPER FOR TRADEMARK INFRINGEMENT CLAIM.11

        1.  Type of Mark: Plaintiff's Mark Is Strong and Incontestable...................................... 12

        2.  Similarity of Marks: The Dominant Portions of the Parties' Marks Are Identical..... 13

        3.  Similarity of Services: Services Are Related and Complementary. .......................... 14

        4.  Channels of Trade: Identity of the Retail Outlets and Overlapping Purchasers. ........ 16

        5.  Similarity of Advertising Media: The Parties' Promotional Efforts Overlap............. 17

        6.  Defendants' Intent: Defendants' Intent does not Weigh in Favor of Either Party...... 18

        7.  Actual Confusion: Actual Confusion Has Occurred in the Marketplace.................... 18

    VII.    SUMMARY JUDGMENT IS PROPER FOR FALSE DESIGNATION OF ORIGIN
         AND UNFAIR COMPETITION CLAIMS....................................................................... 19

    VIII.   SUMMARY JUDGMENT PROPER FOR DILUTION CLAIM. ............................ 19

CONCLUSION AND RELIEF SOUGHT ................................................................ 20

<u>TABLE OF AUTHORITIES</u>

**Cases**

*American Express Co. v. American Express Limousine Srvcs.*,
   772 F. Supp. 729 (E.D.N.Y. 1991). ....................................................... 13, 14

*American Int'l Group, Inc. v. American Int'l Bank*,
   926 F.2d 829 (9th Cir. 1991). ................................................................ 15

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................ 11, 19

*BankAmerica Corp. v. Nation's Bankers Mort., Inc.*,
   92 F. Supp.2d 607 (S.D. Tex. 1999). ....................................... 11, 16, 19, 20

*Beacon Mutual Ins. Co. v. OneBeacon Ins. Grp.*,
   376 F.3d 8 (1st Cir. 2004).................................................................... 12, 17

*Elvis Presley Enters. Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ..................................................... passim

*Freedom Savings and Loan Assn. v. Fidelity Bankers Life Ins. Co.*,
   224 U.S.P.Q. 300 (T.T.A.B. 1984) ........................................................ 15

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
   754 F.2d 591 (5th Cir. 1985), *reh'g denied*, 761 F.2d 695 (5th Cir. 1985) ............ 12, 17

*In re Lehman Bros Inc.*,
   2003 WL 22174261 (T.T.A.B. Sep. 12, 2003) .............................. 15

*Oleg Cassini, Inc. v. Cassini Tailors, Inc.*,
   764 F. Supp. 1104 (W.D. Tex. 1990)........................................... 11

*Pebble Beach Co. v. Tour 18 I Ltd.*,
   155 F.3d 526 (5th Cir. 1998) ............................................................... 11

*Pebble Beach Co. v. Tour 18 I Ltd.*,
   942 F. Supp. 1513 (S.D. Tex. 1996) ...................................................... 20

*Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*,
   83 F. Supp. 2d 810, 819 (S.D. Tex. 1999) ................................... 12, 13, 16, 17

*System Forward America, Inc. v. Martinez*,
   129 Fed. Appx. 88 (5th Cir. 2005)................................................. 11

*Villager, Inc. v. Dial Shoe Co.*,
   256 F. Supp. 694 (E.D. Pa. 1966) ...................................................... 16

*Westchester Media v. PRL USA Holdings, Inc.*,
   214 F.3d 658 (5th Cir. 2000). ........................................................ 12, 19

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
   438 F.2d 482 (5th Cir. 1971) .................................................... 18

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
   698 F.2d 786 (5th Cir. 1983) ..................................................... 12

**Statutes**

15 U.S.C. § 1065 ................................................................................................................... 2

15 U.S.C. § 1114 .............................................................................................................. 1, 11

15 U.S.C. § 1125(a) ......................................................................................................... 1, 19

15 U.S.C. §1125(c) ............................................................................................................... 1

Texas Anti-Dilution Act, Tex. Bus. & Com. Code § 16.29 .................................................. 1

**Rules**

Fed. R. Civ. P. 56(c) ....................................................................................................... 1, 11

**Treatises**

J. T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,
     § 23:12 at p. 23-69 (12/2005) .................................................................................... 18

J. T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,
     § 23:21 at p. 23-97 (9/2006) ...................................................................................... 13

J. T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,
     § 23:49 at p. 23-154 to 23-157 (12/2005) .............................................................. 13, 14

<u>INDEX OF EXHIBITS</u>

Exhibit 1            Declaration of Mark Killen, Senior Vice President of Plaintiff

Exhibit 1A          Record for U.S. Trademark Registration for "AMERICAN CENTURY", Registration No. 2,084,652

Exhibit 1-B         Record for U.S. Trademark Registration for "AMERICAN CENTURY", Registration No. 2,943,710

Exhibit 1-C         Record for U.S. Trademark Application for "AMERICAN CENTURY INVESTMENTS", Serial No. 78/801,281

Exhibit 1-D         DVDs containing examples of Plaintiff's television commercials

Exhibit 1-E         Examples of print advertisements showing use of Plaintiff's mark

Exhibit 1-F         Printouts of a portion of Plaintiff's website showing use of Plaintiff's mark

Exhibit 1-G         Examples of third-party Internet advertisements for Plaintiff showing use of Plaintiff's mark

Exhibit 1-H         Examples of direct mailing advertisements showing use of Plaintiff's mark

Exhibit 1-I         Examples of promotional materials for Plaintiff's "American Century Investments LIVESTRONG" Portfolios

Exhibit 1-J         Examples of advertisements for Plaintiff's "American Century Championship celebrity golf tournament

Exhibit 1-K         List of Plaintiff's different affiliated investment management companies

Exhibit 1-L         Copies of NAF decisions holding certain domain names confusingly similar to Plaintiff's mark

Exhibit 1-M         DVD containing a recorded misdirected telephone call received by Plaintiff

Exhibit 1-N         Copy of letter from an attorney whose client was involved in an accident with a driver insured by Defendants, which was mistakenly sent to Plaintiff

Exhibit 2           Excerpts from American Century Casualty Company and American Century Claims  Service, Inc. 30(b)(6) Deposition (Testimony by Jack H. Ikenaga, Jr.)

Exhibit 3           Excerpts from Deposition of Jack H. Ikenaga, Sr.

iv

Exhibit 4          Excerpts from Opposition Deposition of Jack H. Ikenaga, Jr.

Exhibit 5          Excerpts from Deposition of Jack H. Ikenaga, Jr.

Exhibit 6          Excerpts from Deposition of Philip J. Bither

Exhibit 7          Record for U.S. Trademark Application, Serial No. 78/248,310 for
                   "AMERICAN CENTURY CASUALTY COMPANY & Design"

Exhibit 8          Record for U.S. Trademark Application, Serial No. 78/248,398 for the
                   "AMERICAN CENTURY CLAIMS SERVICE, INC. & Design"

Exhibit 9          Excerpts from Defendants' Responses to Plaintiff's First Set of
                   Interrogatories

Exhibit 10         Screen printouts produced by Defendants showing abbreviations of
                   Defendants' name used in rate-quoting computer program

Exhibit 11         Excerpts from third party Deposition of James M. Hill (testifying as to
                   actual confusion)

Exhibit 12         Excerpts from third party Deposition of Lila Ashmore (testifying as to
                   actual confusion)

Exhibit 13         Excerpts from Deposition of Virginia Clarke (testifying as to actual
                   confusion)

Exhibit 14         Excerpts from Deposition of Jane Ledford (testifying as to actual
                   confusion)

Exhibit 15         Excerpts from Deposition of Angela Orr (testifying as to actual
                   confusion)

Exhibit 16         Declaration of Jean Zayabouth (authenticating copies of third party print
                   advertisements and website printouts relevant to the relatedness of the
                   parties' services)

   Exhibits 16-A   Examples of third party print advertisements from various magazines for
   to 16-O         companies offering insurance and financial services

   Exhibits 16-P to Examples of websites for companies offering automobile insurance and
   16-Z            mutual fund services

Exhibit 17         Declaration of Chris DeAgazio (authenticating third-party television
                   commercials)

   Exhibit 17-A    DVD containing examples of third-party television commercials
                   advertising both insurance and investment services

Exhibit 18         Record of State Farm U.S. Trademark Registration, Registration No.
                   2,539,877

| | |
|---|---|
| Exhibit 19 | System Forward America, Inc. v. Martinez, 129 Fed.Appx. 88 (5th Cir. 2005) |
| Exhibit 20 | MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §23:21 (9/2006) |
| Exhibit 21 | MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §23:49, (12/2005) |
| Exhibit 22 | Freedom Savings and Loan Assn. v. Fidelity Bankers Life Ins. Co., 224 U.S.P.Q. 300 (T.T.A.B. 1984) |
| Exhibit 23 | In re Lehman Bros Inc., 2003 WL 22174261 (T.T.A.B. 2003) |
| Exhibit 24 | MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §23:12 (12/2005) |

## SUMMARY OF THE ARGUMENT

This is a straight-forward case for which summary judgment is appropriate.  Plaintiff owns the mark "AMERICAN CENTURY" for use in connection with a wide variety of investment-related services.  Plaintiff's main business is mutual funds.  The mark "AMERICAN CENTURY" is arbitrary, strong, and registered.  Defendants have not challenged the validity of Plaintiff's "AMERICAN CENTURY" mark or Plaintiff's priority of use.  The parties' marks are essentially identical.  The Defendants' automobile insurance services are closely related and complimentary to Plaintiff's financial services.  In this day and age, numerous companies offer both financial and insurance products, including mutual funds and automobile insurance, under the same exact marks.  Therefore, consumers will logically assume "AMERICAN CENTURY" mutual funds and "AMERICAN CENTURY" automobile insurance are put out by the same or related companies.  Thus, confusion is likely in this case.

The best proof of a likelihood of confusion is evidence of actual confusion.  In this case, Plaintiff can prove that many instances of actual confusion between the parties have already occurred.  The confused have included people involved in automobile accidents with Defendants' insureds, and people connected to insurance claims submitted to Defendants, such as claimants' lawyers.  These people who have experienced actual confusion are potentially customers of Plaintiff's services.  Moreover, Defendants' "AMERICAN CENTURY" marks will inevitably cause more confusion over time, especially as Defendants expand their geographic scope and advertising and promotional efforts, such as through the Internet.

This is also a clear case of dilution under the Texas anti-dilution statute.  Plaintiff's mark is strong, and neither the Plaintiff nor the Defendants are aware of any third party use of "AMERICAN CENTURY" in connection with insurance or financial services.   Thus, Defendants' use of their "AMERICAN CENTURY" marks is likely to dilute the distinctive quality of Plaintiff's "AMERICAN CENTURY" mark.

<u>NATURE AND STAGE OF PROCEEDINGS</u>

This case concerns Plaintiff's claims against Defendants for trademark infringement, false designation of origin, unfair competition, and trademark dilution under federal and Texas state law.  The formal discovery period closed, although the parties agreed to allow for certain depositions after the close of the discovery period.  This Motion is being filed on the October 16, 2006 motions deadline set by the Court.  A bench trial is scheduled for February 2007.

<u>BRIEF IN SUPPORT</u>

Pursuant to Fed. R. Civ. P. 56(c), Plaintiff, American Century Proprietary Holdings, Inc. ("Plaintiff") hereby moves this Court for an order granting summary judgment in its favor as to American Century Casualty Company and American Century Claims Service, Inc.'s ("Defendants") liability on claims for trademark infringement and false designation of origin pursuant to the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), trademark dilution pursuant to the Texas Anti-Dilution Act, Tex. Bus. & Com. Code § 16.29, and unfair competition in violation of Texas Common Law, namely, Plaintiff's Claims I, II, IV and V.[1]  Plaintiff submits various Declarations and submits as follows:[2]

<u>STATEMENT OF UNCONTESTED FACTS</u>

I.      PLAINTIFF AND ITS USE OF "AMERICAN CENTURY"

1.      Plaintiff is a Delaware corporation with a principal place of business in Kansas City, Missouri.  (Ex. 1, Declaration of Mark Killen, Senior Vice President of Plaintiff, ¶ 1).  Plaintiff owns and licenses intellectual property utilized by Plaintiff's parent company and affiliates.  (Ex. 1, ¶ 1)  Plaintiff's parent company set up the Plaintiff company for the purpose of owning, licensing, and aiding in the protection and enforcement of intellectual property.  (Ex. 1, ¶ 1) Plaintiff's parent company and affiliates are companies in the business of  providing financial services.  (Ex. 1, ¶ 1).

2.      In 1995, Plaintiff (through its parent company, affiliates, and predecessor-in-interest, collectively referred to as "Plaintiff") adopted "AMERICAN CENTURY."  (Ex. 1, ¶ 2).  On September 5, 1995, Plaintiff filed an intent-to-use application for the "AMERICAN CENTURY" mark covering mutual fund brokerage, mutual fund distribution, and mutual fund investment services.  (Ex. 1, ¶ 2).

---

[1] Plaintiff is moving for summary judgment as to Defendants' liability on all claims in the above-captioned action, except for Claim III for trademark dilution pursuant to the Lanham Act, 15 U.S.C. §1125(c).  If the Court grants this Motion, Claim III will likely become moot.

[2] When citing to a paragraph in an Exhibit, Plaintiff will cite in the form "(Ex. 1, ¶ 1)."  Attachments to Exhibits will be cited in the form "(Ex. 1-A.)."  Deposition testimony will be cited first in the form "(Ex. 6, Bither Dep. p. _)" and then abbreviated to  "(Ex. 6, p. _)."

3.      On December 5, 1996, Plaintiff began using the "AMERICAN CENTURY" mark for a financial newsletter.  (Ex. 1, ¶ 3).  On January 1, 1997, Plaintiff began using "AMERICAN CENTURY" for a variety of financial services, including mutual fund brokerage, mutual fund distribution, and mutual fund investment services.  (Ex. 1, ¶ 3).

4.      Plaintiff's application for "AMERICAN CENTURY" was allowed, and Reg. No. 2,084,652 for "AMERICAN CENTURY" issued on July 29, 1997.  (Ex. 1, ¶ 4).  Plaintiff is afforded a constructive date of first use of September 5, 1995 for the "AMERICAN CENTURY" mark.  (Ex. 1, ¶ 4).  On December 6, 2002, Plaintiff filed an Affidavit of Use and Incontestability under Sections 8 & 15 of the Trademark Act for Reg. No. 2,084,652.  (Ex. 1, ¶ 4).  The Trademark Office accepted the Affidavit on February 24, 2003, making Reg. No. 2,084,652 incontestable pursuant to 15 U.S.C. § 1065.  (Ex. 1, ¶ 4; see Ex. 1-A for federal registration record).

5.      In the meantime, Plaintiff had expanded the services it offered, and on October 8, 2003, Plaintiff filed a use-based application for the "AMERICAN CENTURY" mark covering a wide variety of financial-related services.  (Ex. 1, ¶ 5).  See Ex. 1-B for the registration record and complete list of goods and services.  Reg. No. 2,943,710 issued on April 26, 2005.  (Ex. 1, ¶ 6).

6.      Plaintiff's Reg. Nos. 2,084,652 and 2,943,710 are valid, and Defendants have not challenged their validity or Plaintiff's priority of rights in "AMERICAN CENTURY."  (Ex. 1, ¶ 7).

7.      Plaintiff also sometimes uses the generic word "INVESTMENTS" with its "AMERICAN CENTURY" mark.  (Ex. 1, ¶ 8).  Plaintiff owns a pending U.S. application Serial No. 78/801,281 for the "AMERICAN CENTURY INVESTMENTS" mark covering a variety of investment services.  (Ex. 1, ¶ 8; see Ex. 1-C for federal application record).

8.      Plaintiff advertises and promotes its services under the mark "AMERICAN CENTURY" through a variety of media, including national television commercials (see DVDs submitted as Ex. 1-D for examples), national print advertising campaigns in publications such as *Time*, *U.S.*

*World & News Report*, *Forbes*, *Wired, Inc.*, *Money*, *Fast Money*, and *Worth* magazines, and the *New York Times*, *Los Angeles Times*, and *Wall Street Journal* (see Ex. 1-E for examples), a website at www.americancentury.com (see Ex. 1-F for examples), third party websites and banner advertising (see Ex. 1-G for examples), direct mailings (see Ex. 1-H for examples) and e-mailings, inbound and outbound teleservices, financial advisors, radio commercials, booklets, flyers, promotional giveaways, event sponsorship, consumer shows, trade shows, media tours, PR efforts, retail investor centers, word-of-mouth, and philanthropic activities. (Ex. 1, ¶ 9).

9.    Plaintiff has partnered with Lance Armstrong, seven-time winner of the Tour de France, to jointly promote Plaintiff's services and Mr. Armstrong's "Lance Armstrong Foundation" ("LAF") and his "LIVESTRONG" fundraising campaign. (Ex. 1, ¶ 10). The "American Century Investments LIVESTRONG" portfolios provide an opportunity for investors to invest in a series of five portfolios thereby enabling an affiliate of Plaintiff to make an annual payment to support the mission of LAF. (Ex. 1, ¶ 10). See sample advertisements at Ex. 1-I.

10.    From 1997-2005, Plaintiff spent over $470 million marketing and promoting services offered under the mark "AMERICAN CENTURY" within the United States. (Ex. 1, ¶ 11).

11.    Plaintiff has sponsored the annual "American Century Championship" celebrity golf tournament in Lake Tahoe, California for the past eight years. (Ex. 1, ¶ 12). In this well-known tournament, national celebrities, such as NBA's Michael Jordan and Charles Barkley and NFL's John Elway and Joe Theisman, among others, play for a $500,000 purse. (Ex. 1, ¶ 12). Approximately 26,000 people attend the three-day event (Ex. 1, ¶ 12), which is shown nationally on cable and broadcast stations, with an averages of 1.5 million viewers each year. (Ex. 1, ¶ 12). During the broadcast, Plaintiff is prominently featured and typically runs up to 20 thirty-second television commercials. Sample advertisements for the event featuring Plaintiff's "AMERICAN CENTURY" mark are attached as Exhibit 1-J.

12.    The American Century Companies Foundation, one of Plaintiff's affiliates, provides funding to not-for-profit agencies in the cities where Plaintiff operates. (Ex. 1, ¶ 13). In 2004

alone, through this affiliate foundation, Plaintiff gave more than 170 different nonprofit organizations funding in amounts totaling in excess of $1.7 million.  (Ex. 1, ¶ 13).

13.     Plaintiff provides a variety of financial services under the mark "AMERICAN CENTURY" to individuals, companies, and institutions interested in investing in mutual funds (see Ex. 1-K for a list of Plaintiff's affiliated investment management companies), personal investment plans, retirement plans, college tuition savings plans, and trusts, among other investment types.  (Ex. 1, ¶ 14).  Plaintiff sells its services directly to its customers, through employee-sponsored 401(k) plans, and through financial advisors, many who sell insurance products.  (Ex. 1, ¶¶ 14, 18).  As of 2006, Plaintiff offered 75 funds to its direct investors.  (Ex. 1, ¶ 14).

14.     People and customers commonly refer to Plaintiff as simply "AMERICAN CENTURY."  (Ex. 1, ¶ 8).

15.     As a result of Plaintiff's substantial advertising and promotional efforts, as well as its dedication to providing excellent services, Plaintiff has had remarkable sales success.  (Ex. 1, ¶ 15).  Currently, Plaintiff has over $100 billion in assets under management.  Plaintiff generates on average $728 million in revenue annually from sales of just mutual funds sold under the AMERICAN CENTURY mark.  (Ex. 1, ¶ 15).  Plaintiff has an estimated 2 million individual, intermediary, and institutional customers worldwide.  (Ex. 1, ¶ 15).

16.     Plaintiff maintains an in-house legal staff whose responsibility includes the protection of Plaintiff's mark.  (Ex. 1, ¶ 16).  Plaintiff employs a third party watch service to help locate any potentially conflicting marks.  (Ex. 1, ¶ 16).  From time to time, Plaintiff has become aware of third parties using "AMERICAN CENTURY" in connection with insurance, mortgage, banking, investment and other financial services, and Plaintiff has successfully objected to such uses.  (Ex. 1, ¶ 16).  For example, Plaintiff initiated separate ICANN proceedings with the National Arbitration Forum ("NAF") objecting to the registration of americancenturyinsurance.com and americancenturycasualty.com.   (Ex. 1, ¶ 16).   NAF held that both domain names were

confusingly similar to Plaintiff's "AMERICAN CENTURY" mark, and that the words "insurance" and "casualty" were descriptive and did not distinguish the domain names from Plaintiff's mark.  (Ex. 1, ¶ 16; see Ex. 1-L for copies of the NAF decisions).  As just another example, Plaintiff obtained a permanent injunction from a federal court against a third party's use of "AMERICAN CENTURY" for mortgage services.  (Ex. 1, ¶ 16).

17.     Plaintiff is unaware of any party other than Defendants using "AMERICAN CENTURY" for insurance products, investment services, or other financial services.  (Ex. 1, ¶ 17).

II.     DEFENDANTS AND THEIR USE OF "AMERICAN CENTURY"

18.     Defendants American Century Casualty Company ("ACCC") and American Century Claims Service, Inc. ("ACCS") are Texas corporations with principal places of business in Houston, Texas.  (Answer to First Amended Complaint (hereinafter "Answer"), ¶¶ 2-3).  ACCS is a subsidiary of ACCC.  (Answer, ¶ 3).  (ACCC and ACCS are jointly referred to herein as "Defendants").

19.     The President of the Defendant companies, Jack Ikenaga, Sr. (the "President") selected the "AMERICAN CENTURY CASUALTY COMPANY" mark.  (Ex. 2, Rule 30(b)(6) Dep. p. 7:3-10).  Before selection of the mark, the President had some experience with trademark disputes (Ex. 3, Ikenaga, Sr. Dep. p. 9:24-10:4), and was aware that federal regulations control trademark usage.  (Ex. 3, Ikenaga, Sr. Dep. p. 14:23-15.1).

20.     Prior to adopting "AMERICAN CENTURY CASUALTY COMPANY" and "AMERICAN CENTURY CLAIMS SERVICE, INC.", Defendants did not conduct trademark searches or seek a legal opinion concerning the availability of the marks.  (Answer, ¶ 20).

21.     In August 2000, ACCC started selling automobile insurance in Georgia under the "AMERICAN CENTURY CASUALTY COMPANY" mark.  (Ex. 4, Ikenaga, Jr. Opp. Dep. 32:7-12).  Today, ACCC sells automobile insurance in Georgia, Texas, Mississippi, Alabama, and Louisiana.  (Ex. 5, Ikenaga, Jr. Dep. p. 9:19-25).  Defendants only began offering non-

standard automobile insurance directly to customers in Texas under the "AMERICAN CENTURY CASUALTY COMPANY" in 2004.  (Ex. 4, p. 28:1-29:1).

22.    Much, but not all, of ACCC's insurance is non-standard automobile insurance, also known as minimum limits coverage.  (Ex. 3, p. 8:19-22; Ex. 5, p. 10:1-9).  However, ACCC sells coverage above minimum limits in Alabama (Ex. 4, p. 12:7-10 and 66:21-24), and ACCC could potentially offer standard automobile insurance under rates approved by the states in which it is licensed.  (Ex. 4, p. 12:11-14:7).  ACCC also sells optional coverage, including supplemental medical coverage, personal injury protection, uninsured motorist bodily damage, and uninsured motorist property damage.  (Ex. 6, Bither Dep. p. 130:3-135:4).  Defendants admit it is possible they could sell additional product lines in the future. (Ex. 3, p. 40:1-9).

23.    In March 2000, ACCS started providing administration, handling, and settlement of automobile insurance claims services in Texas under the "AMERICAN CENTURY CLAIMS SERVICE, INC." mark.  (Answer, ¶ 17; Ex. 4, p. 33:13-16).

24.    On May 12, 2003, Defendants filed applications for "AMERICAN CENTURY CASUALTY COMPANY & Design" and for "AMERICAN CENTURY CLAIMS SERVICE, INC. & Design". (Answer ¶ 19; see Ex. 8 for application records).  Plaintiff opposed both applications, and the opposition proceedings are suspended pending the disposition of this action.

25.    In 2005, Defedants sold approximately 114,402 automobile insurance policies, some of which covered more than one person.  (Ex. 9; Ex. 5, p. 56:14-24)

26.    High-income individuals might apply for Defendants' services (Ex. 4, p. 66:12-22), and some of Defendants' insureds may have 401(k) plans.  (Ex. 3, p. 26:20-22).  Generally, some people who buy non-standard, minimum limits insurance have good driving records and/or would qualify for standard automobile insurance.  (Ex. 3, p. 8:4-12).

27.    Numerous third parties, in addition to Defendants' insureds, independent insurance agents, and claimants insured by third party insurance companies, would likely see Defendants' marks, including vendors for Defendants (Ex. 5, p. 71:5-24), lawyers and their staff, automobile

6

body shop personnel, outside appraisers, claimants' employers, witnesses to relevant automobile accidents, doctors, physician assistants, medical staff, personnel at the Department of Motor Vehicles (Ex. 5, p. 76:3-77:9), people involved in accidents with Defendants' insureds, nurses, police officers, physical therapists, process servers (Ex. 3, p. 31:25-34:19), and employees of third party insurance providers, car dealerships, third-party financial lenders, and banking institutions. (Ex. 5, p. 78:6-79:8).

28.     Defendants' services are advertised and promoted through word-of-mouth (Ex. 5, p. 19:6-21 and p. 35:11-25) and by over one-thousand independent insurance agents.  (Ex. 5, 31:11-21). Some of these insurance agents also sell other services, including financial-related services such as wire money transfers and payday advance services.  (Ex. 4, p. 59:13-25).  In general, many independent insurance agents sell both investment and insurance products.  (Ex. 1, ¶ 18). Defendants' "AMERICAN CENTURY CASUALTY COMPANY" name is listed in the White Pages in the cities where Defendants' offices are located.  (Ex. 5, p. 45:23-46:13).

29.     The independent insurance agents provide rate quotes for Defendants' services to potential customers.  (Ex. 3, p. 37:7-18).  The agents obtain quotes through computer rating programs.  (Ex. 3, p. 37:7-18).  When the agents run the programs, the least expensive quotes appear on the agents' computer screens, and the agents review those quotes with potential customers.  (Ex. 3, p. 37:7-38:2).  On the computer screen, Defendants' full company name does not appear, but is sometimes abbreviated to names such as "ANC Amer. Century Cas." or "American Century Cas." or "American Century Casualt".  (See Ex. 10 for screen printouts).

30.     Some people refer to Defendants as simply "AMERICAN CENTURY" and Defendants admit that "AMERICAN CENTURY" is a natural abbreviation for their company.  (Ex. 4, p. 92:2-11; Ex. 1-M).  Police reports for accidents list Defendants as simply "AMERICAN CENTURY."  (Ex. 11, Hill Dep. p. 25:2-5; Ex. 1-M).  People working in the insurance industry refer to Defendants as "AMERICAN CENTURY" when processing claims involving Defendants.  (Ex. 12, Ashmore Dep. p. 14:6-25 and 45:5-18).  Defendants' insureds, Defendants'

insurance agents, and claimants insured under third party insurance providers also refer to Defendants as "AMERICAN CENTURY." (Ex. 12, p. 45:5-18; Ex. 11, p. 15:25-16:8; Ex. 4, p. 92:2-11).

31.    Defendants' own employees sometimes refer to Defendants as simply "AMERICAN CENTURY."  (Ex. 5, p. 60:22-61:2; Ex. 4, p. 92:2-11).

32.    Defendants currently intend to expand sales of their services into the states of South Carolina, Arkansas, Oklahoma, New Mexico, and Arizona.  (Ex. 3, p. 40:10-20.)  Defendants are licensed in roughly twenty additional states and may expand into these states.  (Ex. 5, 10:14-16).

33.    Defendants plan to launch an Internet website.  (Ex. 4, p. 90:12-20; Ex. 5, p. 52:7-11).

III.    ACTUAL CONFUSION

34.    Except for asking the opinion of a few of their employees, Defendants have not asked their employees who answer telephones whether Defendants have received misdirected telephone calls, and Defendants have not conducted any sort of investigation into whether misdirected telephone calls or mail are received.  (Ex. 4, p. 56:9-15; Ex. 5, p. 64:16-65:4; Ex. 3, p. 23:23-24:3).

35.    It is in the best interest of Defendants' insureds, customers, and claimants to be able to contact Defendants as easily as possible.  (Ex. 2, p. 22:21-25).

36.    Plaintiff has received so many telephone calls from people trying to contact the Defendants, that at least two of Plaintiff's employees keep Defendants' telephone number on hand to redirect callers.  (Ex. 13, Clarke Dep. p. 12:8-13:7; Ex. 14, Ledford Dep. p. 7:16-25 and 8:1-13).

37.    On February 2, 2005, Plaintiff received a telephone call from Lila Ashmore, a State Farm employee, who was trying to reach Defendants to discuss an automobile accident involving one of Defendants' insureds.  (Ex. 12, p. 14:6-21).  Ms. Ashmore had mistakenly obtained Plaintiff's number instead of Defendants' number through a search on yahoo.com for "American Century Insurance."  (Ex. 12, p. 14:6-21).

38.     On August 24, 2005, Plaintiff received a subpoena addressed to "American Century Claims" (Ex. 15, Orr Dep. p. 7:2-24; subpoena appears at end of Ex. 15), that was intended for Defendants.  (Ex. 15, 9:18-10:22).

39.     Beginning in October 2005, Plaintiff received several calls from James Hill, who was trying to reach Defendants to report an automobile accident.  (Ex. 11, p. 25:15-29:9).  The police report for the accident listed just "American Century" as the other driver's insurance provider.  (Ex. 11, p. 25:2-5).  When Mr. Hill looked in the local White Pages, he noted listings for "American Century" and for "American Century Casualty Co."  (Ex. 11, p. 23:12-25:21).  Mr. Hill called the number listed for "American Century" (which was for Plaintiff) because this name matched the name on the police report. (Ex. 11, p. 24:3-25:21).

40.     On June 26, 2006, Plaintiff received a call from a woman trying to reach Defendants to discuss a claim.  (Ex. 1, ¶ 19 and Ex. 1-M for recording of call).  The woman said she had been involved in an automobile accident, and the police report listed just "American Century" as the other driver's insurance provider.  (Ex. 1, ¶ 19 and Ex. 1-M).

41.     Plaintiff received a letter dated August 4, 2006 from an attorney whose client was involved in an accident with a driver insured by Defendants.  (Ex. 1, ¶ 20 and Ex. 1-N for copy of letter).  The letter was addressed to "American Century Insurance Company" at an address of one of Plaintiff's offices. (Ex. 1, ¶ 20 and Ex. 1-N).

42.     Instances of confusion disrupt Plaintiff's business operations.  (Ex. 1, ¶ 21).

43.     Defendants' President and Vice President both admitted that, if one of Plaintiff's customers learned that someone was insured by Defendants, Plaintiff's customer might believe there was a "connection" between Plaintiff and Defendants.  (Ex. 3, p. 32:7-13; Ex. 4, p. 94:21-95:8).

44.     Defendants are not aware of any other companies offering services under the "AMERICAN CENTURY" name.  (Ex. 4, p. 69:14-17).

45.     The Defendants' President considers the present lawsuit to be "silly" (Ex. 3, p. 46:2-10). The President made this judgment even though he has not investigated Plaintiff (Ex. 3, p. 48:11-14), and even though he stated he does not know what Plaintiff does.  (Ex. 3, p. 11:20-12:5). The President stated, "I care less what they [Plaintiff] do."  (Ex. 3, p. 12:5).

IV.     THE MARKETPLACE

46.     Many companies offer investment and insurance services under the same marks, including American International Group, Inc. ("AIG"), State Farm, Ameriprise Financial, Inc., and Prudential Financial, Inc., among many others.  (Ex. 1, ¶ 22).  Sample advertisements prominently featuring investment and insurance services under the same name are shown as Exhibits to the Declarations of Jean Zayabouth and Christopher DeAgazio (Exs. 16 and 17). More specifically, attached as Ex. 16-A to 16-O are examples of national print advertisements; attached as Ex. 16-P to 16-Z are examples of Internet advertisements; and attached as Ex. 17-A is a DVD containing examples of television commercials.

47.     State Farm has registered and uses a trademark featuring the "STATE FARM" mark and the generic words "mutual funds, auto, life, fire."  (Ex. 18).

48.     Defendants would assume that various providers of automobile insurance (such as Hartford and AIG) and providers of life insurance (such as New York Life) also provide financial services (Ex. 3, p. 27:23-28:3; 28:15-29:2; 29:12-22; and 67:19-68:10).   Defendants know that State Farm offers automobile insurance services, mutual funds, and other retirement, financial, and investment tools.  (Ex. 5, p. 61:10-19).  Defendants are aware that various providers of standard automobile insurance also provide non-standard automobile insurance. (Ex. 4, p. 46:20-24 and Ex. 3, p. 67:1-68:13).  Defendants' Vice President believes that the average customer is aware that some companies offer both insurance and financial products. (Ex. 4, p. 248:22-249:5).

49.     Defendants believe that for the most part, they would be able to retain their customers and agents if they changed their name.  (Ex. 2, p. 18:8-19:20).

AUTHORITY AND ARGUMENT

V.      SUMMARY JUDGMENT STANDARD: NO GENUINE ISSUE OF MATERIAL FACT.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering the evidence related to a summary judgment motion, the court must draw all justifiable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact (in this case, the Court) to find for the non-moving party. *Anderson*, 477 U.S. at 248.  Summary judgment can be appropriate on claims requiring determinations of likelihood of confusion and likelihood of dilution.  *See, e.g., System Forward America, Inc. v. Martinez*, 129 Fed. Appx. 88 *1 (5th Cir. 2005) (affirming that, as a matter of law, a likelihood of confusion and dilution exists between "POP-A-LOCK" and "POP-A-CAR-OPEN") (Ex. 19); *BankAmerica Corp. v. Nation's Bankers Mort., Inc.*, 92 F. Supp. 2d 607, 611 (S.D. Tex. 1999); *Oleg Cassini, Inc. v. Cassini Tailors, Inc.*, 764 F. Supp. 1104, 1114 (W.D. Tex. 1990).

VI.     SUMMARY JUDGMENT IS PROPER ON TRADEMARK INFRINGEMENT CLAIM.

To prevail on its trademark infringement under 15 U.S.C. 1114, Plaintiff must prove that (1) it owns a valid and protectable mark; and (2) Defendants' use of its marks creates a likelihood of confusion in the minds of the potential consumers as to the source, affiliation, or sponsorship of Defendants' services.  15 U.S.C. § 1114(1); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 & 543 (5th Cir. 1998).  Plaintiff has established that it owns a protectable and incontestable registered trademark (Facts ¶ 4), and Defendants have not contested the validity of Plaintiff's mark or priority of use.  (Facts ¶ 6).  Thus, the issue is whether Defendants' use of its marks creates a likelihood of confusion.

The Fifth Circuit has enumerated a non-exhaustive list of factors to consider when determining a likelihood of confusion: "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of

the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion." *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 664 (5th Cir. 2000).   No single factor is considered to be dispositive, the court is free to consider other relevant factors, and a finding of a likelihood of confusion does not require a positive finding on a majority of these factors.   *Id.*   Further, confusion is relevant among potential consumers of either party's services (*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985), *reh'g denied*, 761 F.2d 695 (5th Cir. 1985)), and among any third party where the confusion could adversely affect Plaintiff's commercial interests.   *Beacon Mutual Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 16 (1st Cir. 2004) (and cases cited therein); *see also Fuji*, 754 F.2d at 597 (holding the district court erred in only considering as relevant actual confusion on the part of ultimate purchasers).

1.   Type of Mark: Plaintiff's Mark Is Strong and Incontestable.

"'The stronger the mark, the more likely it is that encroachment on it will produce confusion,' and 'the greater protection it receives.'"   *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 819 (S.D. Tex. 1999) (citations omitted).   Plaintiff's "AMERICAN CENTURY" mark is arbitrary, because nothing about the mark describes or even suggests the nature of Plaintiff's investment services.   *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983).   Arbitrary marks are considered to be strong marks. *See Fuji*, 754 F.2d at 597.

The strength of Plaintiff's mark is bolstered by use, advertising, and uniqueness. *Quantum,* 83 F. Supp. 2d at 818-19 (holding that "QUANTUM" is a strong mark, because it is arbitrary in relation to the relevant goods, plaintiff had spent over $1 million in advertising expenses in about nine years, and advertising was nationwide—notwithstanding the fact that QUANTUM is used as a mark by numerous third parties).   Here, Plaintiff has advertised its "AMERICAN CENTURY" mark much more extensively and on a nationwide basis for nearly ten years through wide-reaching media and charitable activity.  (Facts ¶¶ 8-12).

Plaintiff's sales further demonstrate the wide-reaching exposure of Plaintiff's "AMERICAN CENTURY" mark.  More specifically, Plaintiff has over 2 million individual, intermediary, and institutional customers worldwide.  (Facts ¶ 15).  Plaintiff currently manages $100 billion in assets, generating on average $728 million in revenues annually from the sale of just mutual funds.  (Facts ¶ 15).

Finally, Plaintiff's mark is unique: Neither Plaintiff nor Defendants are aware of any third parties that use "AMERICAN CENTURY" as a mark in connection with insurance, investment, or other financial services.   (Facts ¶¶ 17, 44).   Plaintiff's mark here should certainly be considered stronger than the plaintiff's mark in the *Quantum* case, because here, Plaintiff has spent more than $470 million marketing and promoting its products since 1997 (Facts ¶ 10), compared to the *Quantum* plaintiff's expenditure of just $1 million.  The strength of Plaintiff's mark weighs heavily in Plaintiff's favor.

2.      <u>Similarity of Marks: The Dominant Portions of the Parties' Marks Are Identical.</u>

The similarity of two marks is determined by comparing the marks' appearance, sound, and meaning.   J. T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:21 at p. 23-97 (9/2006) ("MCCARTHY") (Ex. 20); *Elvis Presley Enters. Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998).  Greater emphasis is to be given to the dominant and distinctive features of the mark, and lesser emphasis given to generic portions of the marks.  MCCARTHY, § 23:49 at pp. 23-154 to 23-157 (12/2005) (Ex. 21); *Quantum*, 83 F.Supp.2d at 823 (finding that because "QUANTUM" is the dominant part of both "QUANTUM FITNESS" and "QLS QUANTUM LIFESTYLE CENTER", the similarity of the marks factor weighs in favor of plaintiff); *American Express Co. v. American Express Limousine Service Ltd.*, 772 F. Supp. 729, 738 (E.D.N.Y. 1991) (holding "AMERICAN EXPRESS" for financial and travel-related services confusingly similar to "AMERICAN EXPRESS LIMOUSINE SERVICE, LTD." for car service, since addition of descriptive words "would be more likely to cause consumers to focus on the predominant portion of defendants' name.").

13

In this case, "AMERICAN CENTURY" is the dominant and distinctive feature of both parties' marks, because the remaining words used by the parties (the words "CASUALTY COMPANY" and "CLAIMS SERVICE, INC." by Defendants and the word "INVESTMENTS" sometimes used by Plaintiff) are generic. Defendants cannot avoid consumer confusion by simply adding to the distinguishing phrase "AMERICAN CENTURY" words reflecting the generic names for Defendants' services or generic indicators such as "COMPANY" and "INC." *See* MCCARTHY, § 23:49 at p. 23-156 (Ex. 21); *American Express*, 772 F. Supp. at 733 (similarity of marks "not lessened" by combining "AMERICAN EXPRESS" with descriptive words "LIMOUSINE SERVICE, LTD."). Indeed, even if the addition of generic words to the parties' marks caused people to recognize that the parties' designations are distinct, "confusion may result if purchasers are likely to assume that the similarities of the designations indicate a connection between the two users." *Presley*, 141 F.3d at 201.

The marks should also be compared as they are used in commerce. *Id.* Under normal circumstances of use, people logically refer to both parties as simply "AMERICAN CENTURY," including Plaintiff's employees, customers, third parties in the investment industry, and financial advisors (Facts ¶ 14), as well as Defendants' insureds, police officers involved in reporting automobile accidents, people in the insurance industry, and the Defendants themselves. (Facts ¶¶ 30, 31). The tendency for people to refer to Defendants as just "AMERICAN CENTURY" is compounded by the fact that Defendants' advertising, which includes word-of-mouth and recommendations from insurance agents, is primarily verbal. (Facts ¶ 28). Indeed, because the full forms of Defendants' marks do not even appear on the rate reports Defendants' insurance agents share with potential customers (Facts ¶ 29; Ex. 10), the insurance agents are unlikely to refer to the Defendants' full names. The parties' marks are essentially identical, and this factor weighs heavily in Plaintiff's favor.

3.      Similarity of Services: Insurance and Investment Services Are Related and Complementary.

The likelihood of confusion is greater where the services at issue are similar. *Presley*, 141 F.3d at 202. If the parties' services do not directly compete, "the confusion at issue is one of

sponsorship, affiliation, or connection."  *Id.*  The relatedness of insurance and investment services has been recognized by at least one appellate court, as well as the Trademark Trial and Appeal Board ("T.T.A.B.").  *See, e.g., American Int'l Group, Inc. v. American Int'l Bank,* 926 F.2d 829, 832 (9th Cir. 1991) (holding that although insurance companies that provide financial services and banks "are not direct competitors, they both provide financial services.  Their businesses may be sufficiently 'complementary' or 'related' that the public is likely to be confused as to the source of the services."); *Freedom Savings and Loan Assn. v. Fidelity Bankers Life Ins. Co.*, 224 U.S.P.Q. 300, 304 (T.T.A.B. 1984)  (Ex. 22) (finding a likelihood of confusion between "FREEDOM" used with financial services and "FREEDOM" used with life insurance, and noting insurance services were within natural zone of expansion of financial services providers); and *In re Lehman Bros Inc.*, 2003 WL 22174261 *3 (T.T.A.B. Sep. 12, 2003)[3] (stating that insurance and investment services are often marketed to the same individuals, and "those who have attained wealth through investing are candidates for insurance products that will allow them to safeguard the accumulated wealth against loss.") (Ex. 23).

In this case, while the parties' services may not be directly competitive, they are so related and complementary that confusion is inevitable.  Numerous companies sell both investment and insurance services—including both mutual funds and automobile insurance— under the same marks, and many companies advertise both investment and insurance services in the very same advertisements.  (Facts ¶¶ 46, 48; see Exs. 16 and 17 and their attachments, consisting of examples of print advertisements, website printouts, and television commercials featuring both investment and insurance products together in the same advertisement, including in some cases both mutual funds and automobile insurance).  *See also In Re Lehman*, at *3 (Ex. 23) (advertisements located on Nexis by Examiner show "varied investment and insurance services often are available from a single source").  Additionally, many insurance agents and financial advisors sell both insurance and investment products.  (Facts ¶¶ 13, 28, 48)  Thus,

---

[3] While the *Lehman* case is not citable as precedent, the language in the decision is instructive of the T.T.A.B.'s position that insurance and investment services are complimentary and/or related.

people are likely to mistakenly believe that Plaintiff's investment services and Defendants' insurance products, both offered under essentially the same mark, are sold by the same or affiliated companies. *Villager, Inc. v. Dial Shoe Co.*, 256 F. Supp. 694, 701-02 (E.D. Pa. 1966) (finding shoes and clothing are related goods, in part because many companies advertise shoes and clothing together and sell shoes and clothing under one trademark).

Further, Plaintiff is entitled to protection in fields where the public will assume or perceive that an expansion of Plaintiff's services has occurred. *See Presley*, 141 F.3d at 202. As demonstrated by the materials attached to Exhibits 16 and 17, in today's marketplace people encountering Defendants' marks will naturally assume or believe that Plaintiff has expanded into the field of insurance. As more insurance companies begin to offer investment services, and as more investment services companies begin to offer insurance products, consumers will become even more likely to expect that insurance and investment companies offer both types of services under the same name. Moreover, Defendants have taken steps toward expansion by obtaining licenses to sell insurance in approximately twenty additional states. (Facts ¶ 32). Defendants are licensed to offer standard automobile insurance in addition to minimum limits coverage (Facts ¶ 22). In fact, Defendants already provide several different forms of insurance coverage ancillary to minimum limits coverage (Facts ¶ 22), and Defendants already offer automobile insurance above minimum limits in Alabama. (Facts ¶ 22). Defendants plan to launch an Internet website, through which Defendants would advertise their services. (Facts ¶ 33). As Defendants expand, confusion between Plaintiff and Defendants will increase. This factor weighs heavily in Plaintiff's favor.

4.    Channels of Trade: The Identity of the Retail Outlets and Overlapping Purchasers.

If the parties' services are offered at the same level of distribution and at the same type of facilities, the identity of retail outlets is met. *BankAmerica*, 92 F. Supp. 2d at 611 (in applying "retail outlets/purchasers" factor, court found relevant the fact that both parties provided mortgage services through offices in Houston, but did not appear to deem the fact that defendant targeted low-income individuals particularly relevant to analysis); *see also Quantum*, 83 F. Supp.

2d at 826-27 (holding that although there was little direct overlap between the parties' customer bases, this fact did not weaken plaintiff's claim, because the lack of overlap was mitigated in part by the fact that the markets for the parties' products were complimentary).

Many different people are part of the channels of trade through which Defendants provide insurance coverage. The channels of trade begin with Defendants and Defendants' independent insurance agents. In the unfortunate event of an accident, lien, or claim, the channels of trade continue on to claimants (whether insured by Defendants, third parties, or are uninsured and making claims against Defendants' insureds), third party insurance companies and their employees, lawyers and their staff, body shop personnel, appraisers, medical staff, claimants' employers, witnesses to relevant automobile accidents, doctors, physician assistants, Department of Motor Vehicles employees, nurses, police officers, physical therapists, process servers, and employees of car dealerships, third-party financial lenders, and banking institutions. (Facts ¶ 27). Any one of these people could be a customer or a potential customer of Plaintiff who could mistakenly believe that the parties are affiliated and this constitutes actionable infringement. *Beacon Mutual*, 376 F.3d at 16; *Fuji*, 754 F.2d at 597.

While it is unknown if the independent insurance agents who sell Defendants' policies also offer investment services, in general there are many insurance agents who sell investment services. (Facts ¶ 28). Likewise, there are many financial advisors who sell insurance products. (Facts ¶ 13). Consequently, people have come to expect that they can find retail outlets that offer both auto insurance and investment products, such as mutual funds. Thus, this factor weighs in Plaintiff's favor.

5.    Similarity of Advertising Media: The Parties' Promotional Efforts Overlap.

The greater the similarity in advertising campaigns, the greater the likelihood of confusion. *Quantum*, 83 F. Supp. 2d at 827. Defendants currently advertise their services in Texas, Georgia, Mississippi, Louisiana, and Alabama through word-of-mouth and through over one-thousand independent insurance agents. (Facts ¶¶ 21, 28). Plaintiff advertises its services in these same states (as well as in the rest of the United States) through word-of-mouth, through

independent financial advisors (some of whom may also offer insurance products), through wide-reaching media, such as television commercials and national print advertisements in publications such as *Time Magazine* and *U.S. News & World Report*, and through other media. (Facts ¶¶ 8, 13).  Thus, people could come across advertising for both parties' services in similar ways in the same geographic areas, and this factor weighs heavily in Plaintiff's favor.

6.      Defendants' Intent: Defendants' Intent does not Weigh in Favor of Either Party.

Intent is a factor that can only benefit the plaintiff and not the defendants.  *Presley*, 141 F.3d at 203.  While Plaintiff believes there are facts that indicate that Defendants acted in bad faith (Facts ¶ 20), for the purposes of this Motion, Plaintiff does not need to and is not asking the Court to find that the Defendants acted in bad faith.  Thus, this factor is irrelevant to this Motion.

7.      Actual Confusion: The Parties' Concurrent Use of their Marks Has Led to Actual Confusion in the Marketplace.

In most cases, proof of actual confusion is difficult to find.  MCCARTHY, § 23:12 at p. 23-69 (12/2005) (Ex. 24).  While proof of actual confusion is not necessary for a finding of a likelihood of confusion, it is the best evidence of a likelihood of confusion.  *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).  In fact, even "very little proof" of actual confusion may be sufficient to prove a likelihood of confusion, and "an almost overwhelming amount of proof would be necessary to refute such proof." *Id.*.

In this case, one would not expect to find evidence of actual confusion, because (1) it is generally difficult to find; (2) Defendants currently offer their services in only five states (Facts ¶ 21); and (3) Defendants have made little effort to investigate whether incidents of actual confusion have occurred.  (Facts ¶ 34).  Notwithstanding, Plaintiff has found significant evidence of actual confusion, including misdirected telephone calls, a misdirected letter, and even a misdirected subpoena.  (Facts ¶¶ 36-41).  These instances of confusion disrupt Plaintiff's business operations (Facts ¶ 42), and they strongly indicate additional confusion is likely to occur in the future.  The likelihood of confusion will be exacerbated if Defendants expand into

additional states and begin advertising over the Internet, as they have indicated they plan to do. (Facts ¶ 33).  This factor weighs heavily in Plaintiff's favor.

In summary, Plaintiff owns a valid and protectable trademark, and the likelihood of confusion factors weigh heavily in Plaintiff's favor.  Plaintiff submits that, in particular, the application of just the three most important factors in this case (namely, the similarity of the parties' marks, the similarity of the parties' services, and evidence of actual confusion) supports the granting of summary judgment.  These factors alone demonstrate that a rational trier of fact could not possibly determine there is no likelihood of confusion between the parties' marks. *Anderson*, 477 U.S. at 248; *see also Westchester*, 214 F.3d at 664 (noting that a positive finding on a majority of the seven factors is not required to prove likelihood of confusion.)

VII.    SUMMARY JUDGMENT IS ALSO PROPER FOR PLAINTIFF'S CLAIMS OF FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION.

"The Fifth Circuit has held that the basic test for every type of 'unfair competition,' including trademark infringement, is the 'likelihood of confusion' test."  *BankAmerica*, 92 F. Supp. 2d at 610-11.  In view of the showing made above with respect to trademark infringement, summary judgment in Plaintiff's favor regarding Plaintiff's claims of false designation of origin under 15 U.S.C. § 1125(a) and unfair competition in violation of Texas common law is proper.

VIII.    SUMMARY JUDGMENT IS ALSO PROPER FOR PLAINTIFF'S CLAIM OF DILUTION PURSUANT TO THE TEXAS ANTI-DILUTION ACT.

To succeed on its claim for trademark dilution under Texas law, Plaintiff must show that (1) plaintiff owns a distinctive mark; and (2) defendant's use of its mark is likely to dilute plaintiff's mark, regardless of whether the parties' services are competitive.  *BankAmerica,* 92 F. Supp. 2d at 612 (granting plaintiff's motion for summary judgment on Texas anti-dilution statute claims under blurring theory).   When determining whether a mark is distinctive, a court considers factors much like those used in a likelihood of confusion claim, including (1) whether Plaintiff's mark is arbitrary; (2) the length of time Plaintiff has used the mark; (3) the scope of Plaintiff's advertising; (4) the nature and extent of Plaintiff's business; and (5) the scope of

Plaintiff's reputation.  *See Pebble Beach Co. v. Tour 18 I Ltd.*, 942 F. Supp. 1513, 1564-65 (S.D. Tex. 1996).

Plaintiff's mark "AMERICAN CENTURY" is entitled to protection under the Texas anti-dilution statute.  It is arbitrary, and thus strong and distinctive.  Plaintiff has used the mark for almost ten years.  (Facts ¶ 3).  Plaintiff has advertised the mark extensively (Facts ¶¶ 8-11), and Plaintiff's mark is unique, as described above.  The remaining issue is whether Defendants' marks are likely to dilute Plaintiff's mark.  A likelihood of dilution can be shown through "blurring," i.e., where Defendants' use of their marks is likely to gradually diminish the uniqueness or individuality of Plaintiff's mark.  *See BankAmerica,* 92 F. Supp. 2d at 612.  Here, Defendants' use of their marks diminishes the uniqueness and individuality of Plaintiff's mark, because the parties are not aware of any third party use of "AMERICAN CENTURY" with financial or insurance services or services related thereto (Facts ¶¶ 17, 44), and Defendants' marks are essentially identical to Plaintiff's mark.  Thus, Defendants are liable for dilution under Texas anti-dilution statute and summary judgment in Plaintiff's favor is proper.

<u>CONCLUSION AND RELIEF SOUGHT</u>

Plaintiff has priority of use of the "AMERICAN CENTURY" mark for investment services dating back to 1995, and its rights in the mark are incontestable.  Without obtaining a legal opinion regarding the availability of "AMERICAN CENTURY", Defendants adopted and began using their "AMERICAN CENTURY" marks for automobile insurance.  Defendants' marks have caused actual confusion.  The need for injunctive relief in this case is particularly pressing, because actual confusion is likely to increase when Defendants expand into several new states and begin advertising on the Internet, as they have stated they intend to do.

THEREFORE, for the above reasons, American Century Proprietary Holdings, Inc. respectfully requests the Court grant its Motion for Summary Judgment as to Defendants' Liability on Claims I, II, IV and V, enjoin Defendants' continued use of any marks containing the phrase "AMERICAN CENTURY," or any words or phrases confusingly similar thereto, and for such further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

Date: <u>October 16, 2006</u>         By:   <u>/Mark J. Liss/</u>

Mark J. Liss  (IL Bar No. 6181002)
Tamara A. Miller (IL Bar No. 6237169P)
Caroline L. Stevens (IL Bar No. 6274252)
Leydig, Voit  & Mayer, LTD.
Two Prudential Plaza--Suite 4900
Chicago, Illinois  60601
Telephone: (312) 616-5600
Facsimile: (312) 616-5700

Michael K. Oldham
Tex. Bar No. 00798405
Southern Dist. of Tex. Bar No. 21486
Gibbs & Bruns, L.L.P.
1100 Louisiana
Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

Attorneys for Plaintiff
American Century Proprietary Holdings, Inc.