**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMERICAN CENTURY PROPRIETARY | § | |
| HOLDINGS, INC., | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-2179 |
| | § | |
| AMERICAN CENTURY CASUALTY | § | |
| COMPANY and AMERICAN CENTURY | § | |
| CLAIMS SERVICE, INC., | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION TO DENY PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON CLAIMS I, II, IV, AND V**

This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #31). In this action, Plaintiff American Century Proprietary Holdings, Inc. ("Plaintiff") alleges that Defendants American Century Casualty Company and American Century Claims Service, Inc. (collectively "Defendants") are unlawfully violating its rights in the registered mark "AMERICAN CENTURY." (Amended Complaint ["Complaint"], Docket Entry #28, at 1-3). Now pending is Plaintiff's motion for a judgment in its favor on the majority of its claims. (Docket Entry #37). Defendants filed a response to the motion, and Plaintiff filed a reply, as well as a supplement to the original motion. (Docket Entries #40, 41, and 44). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be DENIED.

**Background**

In this action, Plaintiff American Century Proprietary Holdings, Inc., alleges service mark[1] infringement in violation of the Lanham Trademark Act ("Lanham Act"), codified at 15 U.S.C. §§ 1051 *et seq.*, the Texas Anti-Dilution Statute, codified at Tex. Bus. & Com. Code § 16.29, as well as the common law tort of unfair competition. (Complaint at 2). Plaintiff is an investment services business that is incorporated in Delaware and has its principal place of business in Kansas City, Missouri. (Motion at Exhibit ["Ex."] 1). Plaintiff uses the mark "AMERICAN CENTURY" in providing financial services throughout the world. (*Id.*). On September 5, 1995, Plaintiff filed an "intent-to-use" application to register the "AMERICAN CENTURY" mark[2] with the United States Trademark Office. (*Id.*). In that application, Plaintiff declared its intent to use the mark for brokerage, distribution, and investment services. (*Id.*). Plaintiff first used the mark on December 5, 1996, in a financial newsletter, and, on January 1, 1997, it began using it for all other brokerage, distribution, and investment services. (*Id.*). On July 29, 1997, Plaintiff's mark was registered as No. 2,084,652. (*Id.* at Ex. 1, 1-A). Plaintiff then filed an Affidavit of Use and Incontestability, which was accepted by the Trademark Office on February 24, 2003. (*Id.* at 2, Ex. 1, 1-A). That registration purportedly rendered its trademark, No. 2,084,652, incontestable. (*Id.*). On April 26, 2005, Plaintiff acquired a second registration for the AMERICAN CENTURY mark, No. 2,943,710, which covers a wider variety of financial services, beyond mutual funds. (*Id.* at 2, Ex. A, 1-B). Today, Plaintiff has a third application pending with the Trademark Office, this one for the mark

---

[1] While often referred to as a "mark" or a "trademark," the type of mark at issue in this case is actually a "service mark." *See* 15 U.S.C. § 1127. A "service mark" is defined in the Lanham Act as "any word, name, symbol, or device, or any combination thereof" which is used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." *Id.*

[2] "[T]he owner of a trademark used in commerce may request registration of its trademark on the principal register" and, if the mark is registered, it is entitled to protection under the Act. *Id.* at §§ 1051(a)(1), 1053.

"AMERICAN CENTURY INVESTMENTS." (*Id*. at 2, Ex. A, 1-C). This third mark is also to be used in connection with financial services. (*Id*.).

Defendant American Century Casualty Company ("ACCC") is an insurance services corporation, with its principal place of business in Houston, Texas. (Answer, Docket Entry #26, at 2). ACCC uses the mark "AMERICAN CENTURY CASUALTY COMPANY," together with an "Eagle Design" logo, in connection with its automobile insurance underwriting and claims processing services. (Response at Ex. 3, 4). Its subsidiary and co-defendant, American Century Claims Service, Inc. ("ACCS"), is also a Texas corporation with its principal place of business, in Houston, Texas. (Answer at 2). ACCS uses the mark "AMERICAN CENTURY CLAIMS SERVICE, INC.," and a similar eagle logo, in connection with its business administrating automobile insurance claims. (Response at Ex. 3, 5). Both Defendants are licensed to provide property and casualty insurance services, although it appears that they sell only automobile policies. (Motion at 5-6; Response at 1). Currently, ACCC provides coverage policies in Texas, Georgia, Mississippi, Alabama, and Louisiana, while ACCS does business only within Texas. (Motion at Ex. 5; Response at Ex. 3). While it is unclear when Defendants first used their marks, it appears that ACCC adopted the AMERICAN CENTURY CASUALTY COMPANY mark at least as early as January 19, 1996, and that ACCS was using its mark as early as March, 2000. (Motion at Ex. 4; Response at Ex. 1, 2). In May, 2003, ACCC filed an application for the "AMERICAN CENTURY CASUALTY COMPANY & [Eagle] Design" mark, and ACCS filed an application for the "AMERICAN CENTURY CLAIMS SERVICE, INC. & [Eagle] Design" mark. (Answer at 5; Motion at Ex. 8). In response, Plaintiff filed this lawsuit. (Docket Entry #1).

In its First Amended Complaint, Plaintiff brings five claims against these Defendants: (i) trademark infringement in violation of section 1114 of the Lanham Act ("Claim I"); (ii) false

3

designation of origin in violation of section 1125(a) of the Lanham Act ("Claim II"); (iii) trademark dilution in violation of section 1125(c) of the Lanham Act ("Claim III"); (iv) trademark dilution in violation of the Texas Anti-Dilution Statute ("Claim IV"); and (v) unfair competition under the Texas common law ("Claim V").  Plaintiff now seeks summary judgment on Claims I, II, IV, and V.[3] Having considered the pleadings, the evidence submitted, and the applicable law, the court finds that genuine issues of material fact exist as to each of these claims, so that summary judgment should be denied.

**Standard of Review**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  Under Rule 56(c), the moving party "bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003).  The party moving for summary judgment "'must demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non-movant's case.'"  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movants' response.  *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at 1075.

---

[3] Plaintiff did not move for summary judgment on Claim III, but states that, if the court grants its motion on the other claims, "Claim III will likely become moot."  (Motion at 1 n.1).

When the moving party has met its Rule 56 burden, the non-moving parties cannot survive a motion for summary judgment merely by resting on the allegations in their pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349-50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Instead, they "must 'go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075); *see Izen v. Catalina*, 398 F.3d 363, 366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385. Further, they "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)); *see Boudreaux*, 402 F.3d at 540. To meet their burden, the non-moving parties must present "significant probative" evidence indicating that there are issues of fact remaining for trial. *See Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000); *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). In deciding a summary judgment motion, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Taita Chem. Co.*, 246 F.3d at 385.

## Discussion

Before plumbing the particular claims before the court, a brief summary of the relevant law is necessary. "Traditional trademark infringement law is a part of the broader law of unfair competition, . . . that has its sources in English common law, and was largely codified in [the Lanham Act]." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003) (citations omitted); *see In re Hot-Hed Inc.*, 477 F.3d 320, 325 (5th Cir. 2007). "That law broadly prohibits uses of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service." *Moseley*, 537 U.S. at 428 (citing 15 U.S.C. §§ 1114, 1125(a)(1)(A)); *accord Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 (5th Cir. 2003). "Infringement law protects

5

consumers from being misled by the use of infringing marks and also protects producers from unfair practices by an 'imitating competitor.'" *Moseley*, 537 U.S. at 428 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-164 (1995)).  The laws against trademark dilution, on the other hand, "are not the product of common-law development, and are not motivated by an interest in protecting consumers." *Id.* at 429.  Instead, they are largely a creature of statute, and concern the effect on the owner of a mark of "the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product" or service.  *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 489 (5th Cir. 2004).  In any event, cases involving infringement, unfair competition, or dilution generally involve issues of fact.  *See Society of Fin. Examiners v. National Ass'n of Certified Fraud Examiners Inc.*, 41 F.3d 223, 225 (5th Cir. 1995); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980).  As such, summary judgment is often inappropriate.  *See General Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004); *Society of Fin. Examiners*, 41 F.3d at 225-26, 229; *see also King v. Ames*, 179 F.3d 370, 374 (5th Cir. 1999) (distinguishing that case from the general circumstances, because the court was "not confronted with either nearly identical marks or a similar acronym," and, because the record before it was "devoid of evidence or facts that would permit a reasonable jury to find that consumers were deceived").

### Claims I, II, and V

Plaintiff seeks summary judgment on its claims for infringement under section 1114 of the Lanham Act (Claim I), false designation of origin under section 1125(a) of the Lanham Act (Claim II), and unfair competition under Texas common law (Claim V).  The Fifth Circuit has held that the evidentiary test for success on each of these claims is the "likelihood of confusion" among consumers as to the marks at issue.  *See Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 329 n.36 (5th Cir. 2006); *Scott Fetzer Co.*, 381 F.3d at 483-84; *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d

6

658, 663-64 & n.1 (5th Cir. 2000); *BankAmerica Corp. v. Nation's Bankers Mortgage, Inc.*, 92 F.

Supp. 2d 607, 610-611 (S.D. Tex. 1999) (citing *Chevron Chem. Co. v. Voluntary Purchasing Groups,*

*Inc.*, 659 F.2d 695, 703 (5th Cir. 1981)).  Under this likelihood of confusion test, Plaintiff must prove

that Defendants' use of its mark "creates a likelihood of confusion in the minds of potential

consumers as to the 'source, affiliation, or sponsorship'" of Defendants' services.  *Westchester*

*Media*, 214 F.3d at 663-64 & n.1; *see* 15 U.S.C. §§ 1114(1), 1125(a); *Scott Fetzer Co.*, 381 F.3d at

483-84.  "A 'likelihood of confusion' means that confusion is not just possible, but probable."  *Id.*

(citing *Westchester Media*, 214 F.3d at 663-64).

Further, the Fifth Circuit "has set out a long list of non-exclusive, non-dispositive factors to

consider when determining whether a use can result in confusion."  *Lyons P'ship v. Giannoulas*, 179

F.3d 384, 388 (5th Cir. 1999).  These factors, known as the "digits of confusion," are the following:

> (1) the type and strength of trademark allegedly infringed, (2) the similarity between
> the two marks, (3) the similarity of the products or services, (4) the identity of the
> retail outlets and purchasers, (5) the identity of the advertising media used, (6) the
> defendant's intent, and (7) any evidence of actual confusion.

*Id.* at 388-89 (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)); *accord*

*Scott Fetzer Co.*, 381 F.3d at 484-85; *Westchester Media*, 214 F.3d at 664.  However, these factors

"do not apply mechanically to every case and can serve only as guides, not as an exact calculus."

*Scott Fetzer Co.*, 381 F.3d at 485 (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th

Cir. 1998)).  In fact, it may be that "several of the digits will appear to indicate confusion even if no

confusion is likely."  *Id.* (citing *Lyons P'ship*, 179 F.3d at 389; *Pebble Beach Co.*, 155 F.3d at

546-47).  For this reason, when determining whether there is a likelihood of confusion, the court must

bear in mind two principles.  *See id.*  First, the "application of each digit" must be considered "in light

of the specific circumstances of the case; otherwise, we risk inadvertently lowering the standard of

confusion."  *Id.* (citing *Lyons P'ship*, 179 F.3d at 389-90; *Pebble Beach Co.*, 155 F.3d at 547).  And

second, the court "must 'consider the marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements.'"  *Id.* (quoting *Elvis Presley Enters.*, 141 F.3d at 197).  In short, "different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved."  *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 490 (5th Cir. 1992).  Here, the parties have briefed all of the listed factors, and each will be addressed in order.

(1)    ***Type and Strength of Mark***

A "particular 'mark' qualifies for trademark protection only to the extent that it distinguishes a product."  *Sport Supply Group, Inc.*, 335 F.3d at 461; *see Igloo Prods. Corp. v. Brantex, Inc.*, 202 F.3d 814, 816 (5th Cir. 2000) (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 267-68 (5th Cir. 1999)).  "Marks are often classified in categories of generally increasing distinctiveness." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).  These categories include the following types of marks:  (i) generic; (ii) descriptive; (iii) suggestive; (iv) arbitrary; or (v) fanciful.  *See id.*; *Sport Supply Group, Inc.*, 335 F.3d at 461 n.7.  A "generic mark" is one which "refers to an entire class of products (such as 'airplane' or 'computer'), does not distinguish a product at all, and therefore receives no protection under trademark law."  *Id.*; *see Two Pesos, Inc.*, 505 U.S. at 768; *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981).  A "descriptive mark," such as "Holiday Inn," "tells something about the product," but "is protected only when secondary meaning[4] is shown."  *Id.* (citing *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111 (5th Cir. 1979)); *see Two Pesos, Inc.*, 505 U.S. at 768; *Sport Supply Group, Inc.*, 335 F.3d at 461 n.7.  A "suggestive mark," on the other hand, "merely

---

[4] "Secondary meaning is used generally to indicate that a mark or dress 'has come through use to be uniquely associated with a specific source.'"  *Two Pesos, Inc.*, 505 U.S. at 766 (citations omitted).

suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Id.* (finding that "[a]n example might be 'Business Week'").  An "arbitrary mark," such as "Apple Computer," uses "a common word in an unfamiliar way." *Id.*  Finally, a "fanciful mark" is "'not a real word at all,' but is invented solely for the purpose of identifying a particular product." *Id.* (citing "Kodak" and "Exxon" as examples). Here, Plaintiff's mark contains the obviously common words "American" and "Century."  However, neither of these words is commonly associated with financial services.  Under these circumstances, the parties agree that the disputed mark falls into the "arbitrary" category of common words used "in an unfamiliar way."  (Motion at 12; Response at 6).  *See id.*

Generally, arbitrary marks "are deemed inherently distinctive and are entitled to protection" because "their intrinsic nature serves to identify a particular source of a product" or service.  *Two Pesos, Inc.*, 505 U.S. at 768; *see Sun Banks of Florida, Inc.*, 651 F.2d at 315 (citing *Amstar Corp.*, 615 F.2d at 259).  However, under the Lanham Act, even a registered trademark is subject to challenge by an entity that was using the mark before the registration was effective.  *See*, *e.g.*, 15 U.S.C. §§ 1065, 1115; *see also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980). In this case, Defendants argue that the mark is not entitled to the typical degree of protection because they had actually been using the mark before Plaintiff ever registered it.  (Response at 6).   The evidence shows that Defendants did, in fact, use the mark as early as January 1996, while Plaintiff did not begin using it until December of that year.  (Motion at Ex. 1 and 4; Response at Ex. 1 and 2). However, when, as here, a mark has been registered, the Lanham Act designates a "constructive use" date, that is, the date on which the application for registration was filed.  *See* 15 U.S.C. § 1057(c). Indeed, the statute states, specifically, that:

> the filing of the application to register such mark shall constitute constructive use of
> the mark, conferring a right of priority, nationwide in effect, on or in connection with
> the goods or services specified in the registration against any other person except for

a person whose mark has not been abandoned and who, prior to such filing--

    (1) has used the mark;

    (2) has filed an application to register the mark which is pending or has resulted in registration of the mark; or

    (3) has filed a foreign application to register the mark on the basis of which he or she has acquired a right of priority, and timely files an application under section 1126(d) of this title to register the mark which is pending or has resulted in registration of the mark.

*Id.* Here, the record is clear that Plaintiff filed its application on September 5, 1995. (Motion at Ex. 1). Defendants, on the other hand, did not begin using the mark until 1996, and it is only recently that they made any attempt to register their own marks. (*Id.* at Ex. 4; Response at Ex. 1 and 2). Under the Lanham Act, then, Plaintiff's mark has a constructive first use date of September 5, 1995. *See* 15 U.S.C. § 1057(c). On these facts, the court is persuaded that, the "type and strength of mark" weighs in favor of Plaintiff.

    (2)    ***Similarity Between Marks***

    The degree of similarity between marks "is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 201; *see Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 774 (S.D. Tex. 2005); *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 822 (S.D. Tex. 1999). "[T]he greater the similarity in the design of the trademarks, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). The Fifth Circuit has noted that "[e]ven if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users." *Elvis Presley Enters.*, 141 F.3d at 201 (citations omitted). For these reasons, the Fifth Circuit has determined that "the relevant inquiry," for purposes of this digit, "is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the

two users are somehow associated." *Id.* (citations omitted); *accord Quantum Fitness Corp.*, 83 F. Supp. 2d at 822.

As a general rule, the similarity in the design and appearance of marks "is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." *Exxon Corp.*, 628 F.2d at 504 (citing *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979); *Restatement of Torts* § 729, Comment b (1938)); *see Sun Banks of Florida*, 651 F.2d at 317-19; *Quantum Fitness Corp.*, 83 F. Supp. 2d at 823-24 (citing *Universal Money Ctrs., Inc. v. AT & T*, 22 F.3d 1527, 1530-31 (10th Cir. 1994); *Amstar Corp.*, 615 F.2d at 261). In *Universal Money Centers*, for instance, the court found that "[e]ven though the dominant portion of these marks may have been the term 'Universal,'" there was a "slim likelihood of confusion because of differences in the overall design of the cards, including lettering styles, logos, and coloring schemes." *Quantum Fitness Corp.*, 83 F. Supp. 2d at 824 (citing *Universal Money Ctrs., Inc.*, 22 F.3d at 1531). The court also pointed out that the defendant never used the word "universal" without the word "money," while the plaintiff never used the word "universal" with the word "money," but instead, always with the "AT&T" logo. *See Universal Money Ctrs., Inc.*, 22 F.3d at 1531. In short, even though the marks shared the word "universal," the differences in the overall design and appearance of the marks weighed in favor of a finding of no infringement. *See id.*; *see also Exxon Corp.*, 628 F.2d at 504-05; *Amstar Corp.*, 615 F.2d at 261; *Quantum Fitness Corp.*, 83 F. Supp. 2d at 823-24.

In this case, Plaintiff argues that the "similarity of marks" weighs in its favor because the words "AMERICAN CENTURY" are the distinctive feature of each of the parties' marks. (Motion at 14). Plaintiff contends that the words "CASUALTY COMPANY" and "CLAIMS SERVICE" are generic, and that, for this reason, people will "logically refer to both parties as simply 'AMERICAN CENTURY.'" (*Id.*). As evidence, Plaintiff points to the fact that "the full forms of Defendants'

marks do not even appear on the rate reports Defendants' insurance agents share with potential customers." (*Id.* at 14 and Ex. 10). None of these forms, however, refers to Defendants' companies as "AMERICAN CENTURY." Instead, they contain abbreviations that are less similar to Plaintiff's mark. (*See id.* at Ex. 10). These abbreviations vary from "Amer. Century Cas." to "ACCC." (*Id.* at Ex. 10). In fact, there is no evidence that Defendants ever use the words "AMERICAN CENTURY" alone, whether on their letterhead, in their correspondence, or on their administrative forms. Instead, the evidence reveals the contrary, that is, that Defendants always refer to their companies as "AMERICAN CENTURY CASUALTY INSURANCE COMPANY," "AMERICAN CENTURY CASUALTY COMPANY," "AMERICAN CENTURY CASUALTY," "ACCC," "AMERICAN CENTURY CLAIMS SERVICE, INC.," or "ACCS." (Motion at Ex. 5, p. 72, 76, and Ex. 7, 8, and 10; Supplement at Ex. 1-8; Response at Ex. 2). Plaintiff, on the other hand, uses the "AMERICAN CENTURY" mark either alone or followed by the words "PROPRIETY HOLDINGS, INC." or "INVESTMENTS." (Motion at Ex. 1). There is no evidence that Plaintiff has ever used the words "casualty," "insurance," or "claims" in conjunction with its mark. Nor is there evidence that Defendants use the word "investments" or any other language that suggests that they provide financial services in addition to insurance. Similar facts have been held to weigh in favor of a finding of "no infringement." *See Universal Money Ctrs., Inc.*, 22 F.3d at 1531; *Sun Banks of Florida*, 651 F.2d at 317-19; *Amstar Corp.*, 615 F.2d at 261; *Quantum Fitness Corp.*, 83 F. Supp. 2d at 824.

The evidence also shows that, immediately adjacent to their company name, Defendants typically include their logo, which includes a picture of an eagle, with "American" written above the bird and "Century Casualty Company" or "Century Claims Service, Inc." written below it. (Motion at Ex. 5, p. 72, 76, and Ex. 7, 8, and 10; Supplement at Ex. 1-8; Response at Ex. 2). Further evidence shows that Plaintiff typically utilizes a logo which uses a picture of a tree immediately above the words "AMERICAN CENTURY" or the words "AMERICAN CENTURY INVESTMENTS." (*See,*

12

*e.g.*, Motion at Ex. 1-E, 1-F, 1-G).  Courts have held that the prominent use of different logos supports a finding that marks are not confusingly similar.  *See Universal Money Ctrs., Inc.*, 22 F.3d at 1531 (citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981)); *Quantum Fitness Corp.*, 83 F. Supp. 2d at 824.

In sum, while the parties' marks all contain the words "AMERICAN CENTURY," they are nevertheless different in appearance, sound, and meaning.  *See Elvis Presley Enters.*, 141 F.3d at 201. For this reason, Plaintiff has not shown that "the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated," and this factor does not weigh in its favor.  *See id.*; *Universal Money Ctrs., Inc.*, 22 F.3d at 1530-31; *Sun Banks of Florida*, 651 F.2d at 317-19; *Amstar Corp.*, 615 F.2d at 261; *Bell*, 389 F. Supp. 2d at 774; *Quantum Fitness Corp.*, 83 F. Supp. 2d at 823-24.

   (3) ***Similarity of Services***

As a general rule, "'[t]he greater the similarity between the products and services, the greater the likelihood of confusion.'"  *Moore Bus. Forms, Inc.*, 960 F.2d at 490 (quoting *Exxon Corp.*, 628 F.2d at 505); *accord Elvis Presley Enters.*, 141 F.3d at 202.  "Direct competition between the parties' services or products is not required in order to find a likelihood of confusion."  *Id.* (citing *Professional Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669-70 (5th Cir.1975)). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection."  *Id.* (citing *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977)).  "The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand."  *Id.* (citation omitted).  "'If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.'"  *Id.*  Whether this

digit weighs in Plaintiff's favor, then, depends on whether consumers are likely to view the parties' businesses as logically affiliated or connected.  *See id.*

Here, there is no dispute that Plaintiff provides financial services, and not insurance coverage. There is also no dispute that Defendants provide automobile insurance coverage, and not financial services.  However, Plaintiff argues that, because there are a growing number of companies that offer both financial and insurance services, "people encountering Defendants' marks will naturally assume or believe that Plaintiff has expanded into the field of insurance," and vice versa.  (Motion at 16). As evidence, Plaintiff points to examples of print advertisements, website pages, and television commercials from companies that provide both investment and insurance services, including Hartford, Fidelity Investments, Prudential Financial, and Northwestern Mutual.  (*Id.* at Ex. 16 and 17).  In addition, Plaintiff points to evidence that Defendants provide standard automobile insurance in addition to minimum limits coverage, that they have obtained licenses to sell automobile insurance in other states, and that they have plans to launch a website to advertise their existing and expanding services.  (*Id.* at Ex. 3, 4, and 5).  Plaintiff argues that "[a]s Defendants expand, confusion between Plaintiff and Defendants will increase."  (Motion at 16).  Defendants, on the other hand, have submitted evidence to show that they provide only automobile insurance services, that they have no intention of expanding into financial services, and that they have never portrayed themselves to the public as anything other than an "insurance casualty company" or "claims service."  (Response at Ex. 3 and 7).  This evidence, as well as the differences in the parties' marks, invites a question as to whether customers would be likely to confuse the two enterprises because of Defendants' use of the "AMERICAN CENTURY" mark.  *See Elvis Presley Enters.*, 141 F.3d at 202; *Moore Bus. Forms, Inc.*, 960 F.2d at 490.  For that reason, Plaintiff has not shown that the "similarity of services" factor weighs in its favor.

(4)     *Identity of Retail Outlets and Purchasers*

"[I]f the parties' goods and services are offered at the same level of distribution and at the same type of facilities, the identity of service factor is met." *Bell*, 389 F. Supp. 2d at 775.  However, "[d]issimilarities between the retail outlets 'lessen the possibility of confusion, mistake, or deception.'" *Moore Bus. Forms, Inc.*, 960 F.2d at 490 (quoting *Exxon Corp.*, 628 F.2d at 505); *accord Amstar Corp.*, 615 F.2d at 262.  Defendants have submitted evidence to show that they provide their services "exclusively through independent insurance agents, who primarily sell non-standard automobile insurance."  (Response at Ex. 3).  Plaintiff, in turn, has provided no evidence that any of these agents also sell financial services.  In fact, Plaintiff concedes that "it is unknown if the independent insurance agents who sell Defendants' policies also offer investment services." (Motion at 17).  Nor does Plaintiff offer any evidence to suggest that purchasers of Defendants' services are likely to also shop for the financial services it offers.  (*See* Response at 9).  In short, Plaintiff has not shown that the "identity of retail outlets and purchasers" factor weighs in its favor.

(5)     *Identity of Advertising Media*

While parties need not "advertise on the same scale for media to be identical, there must be evidence that 'the parties aim their advertising campaigns at the same region and the same consumers.'" *Bell*, 389 F. Supp. 2d at 775 (citation omitted).  Generally, "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 827 (S.D. Tex. 1999) (citing *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 555 (10th Cir. 1998)).  In its motion, Plaintiff has presented corroborating evidence that it advertises to people and businesses throughout the United States and world-wide:

> [Plaintiff] advertises and promotes its services under the mark "AMERICAN CENTURY" through a variety of media, including national television commercials, national print advertising campaigns in publications such as *Time*, *U.S. World & News Report*, *Forbes*, *Wired, Inc.*, *Money*, *Fast Money*, and *Worth* magazines, and the *New York Times*, *Los Angeles Times*, and *Wall Street Journal*, a website at www.americancentury.com, third party websites and banner advertising, direct mailings and e-mailings, inbound and outbound teleservices, financial advisors, radio commercials, booklets, flyers, promotional giveaways, event sponsorship, consumer shows, trade shows, media tours, PR efforts, retail investor centers, word-of-mouth, and philanthropic activities.

(Motion at 2-3 and Ex. 1). The evidence also shows that, while Defendants' services are advertised through word-of-mouth and through independent insurance agents, it is sold only in the states of Texas, Georgia, Mississippi, Louisiana, and Alabama. (Motion at Ex. 5; Response at Ex. 3). There is no evidence that Defendants advertise in wide-ranging media, as Plaintiff does. (Response at 2). Indeed, there is no evidence that Defendants advertise in any media, aside from the fact that "[ACCC's] name is listed in the White Pages in the cities where Defendants' offices are located." (Motion at 7 and Ex. 5; *see* Response at 2 and Ex. 3). It is also undisputed that Defendants have never operated a website directed to the public. (Response at Ex. 3). Under these facts, there is little evidence of overlapping advertising. First, to the extent that advertising is aimed at the same region, Defendants' advertising reaches no more than five states, while Plaintiff's ads have a world-wide reach. *See Bell*, 389 F. Supp. 2d at 775. Further, there is no evidence that the parties "aim their advertising [at] the same consumers," and, finally, there is little overlap in the marketing approaches used by the parties. *See Quantum Fitness Corp.*, 83 F. Supp. 2d at 827; *Bell*, 389 F. Supp. 2d at 775. Under these circumstances, Plaintiff has not shown that the advertising factor weighs in its favor.

(6)    <strong><em>Defendants' Intent</em></strong>

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 203 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)); *accord Quantum Fitness Corp.*, 83 F. Supp.

16

2d at 828.  Instead, the focus of the "intent" element "is whether defendant had the intent to derive

benefit from the reputation or goodwill of plaintiff."  *Id.* (citing *Sicilia Di R. Biebow & Co. v. Cox*,

732 F.2d 417, 431 (5th Cir. 1984)).  If the defendant acted in good faith, "this digit of confusion

becomes a nonfactor in the likelihood-of-confusion analysis," rather than weighing in the defendant's

favor.  *Elvis Presley Enters.*, 141 F.3d at 203 (citing *Fuji Photo Film Co.*, 754 F.2d at 597-98);

*accord Quantum Fitness Corp.*, 83 F. Supp. 2d at 829.  In this case, there is no evidence that

Defendants acted in bad faith.  In fact, in its motion, Plaintiff states that it "is not asking the Court

to find that the Defendants acted in bad faith."  (Motion at 18).  Under these circumstances,

Defendants' intent does not weigh in Plaintiff's favor and, in fact, is probably immaterial to the

likelihood of confusion analysis.  *See Elvis Presley Enters.*, 141 F.3d at 203.

(7)     ***Actual Confusion***

While not necessary for a finding of a likelihood of confusion, "[e]vidence of actual confusion

is often the best evidence of likelihood of confusion."  *Moore Bus. Forms, Inc.*, 960 F.2d at 491; *see*

*Elvis Presley Enters.*, 141 F.3d at 203; *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438

F.2d 482, 489 (5th Cir. 1971); *Quantum Fitness Corp.*, 83 F. Supp. 2d at 829.  "To show actual

confusion, a plaintiff may rely on anecdotal instances of consumer confusion."  *Scott Fetzer Co.*, 381

F.3d at 486 (citing *Moore Bus. Forms, Inc.*, 960 F.2d at 491).  "An absence of, or minimal, actual

confusion, however, over an extended period of time of concurrent sales weighs against a likelihood

of confusion."  *Elvis Presley Enters.*, 141 F.3d at 204; *see Amstar Corp.*, 615 F.3d at 263.

Here, Plaintiff presents primarily anecdotal evidence to show the existence of actual

confusion.  (Motion at 18-19 and Ex. 1, 11, 12, 13, 14, and 15).  Much of this evidence is from two

of Plaintiff's employees, who reportedly received telephone calls meant for Defendants.  (*Id.* at Ex.

11, 12, 13, 14).  There is also evidence of two occasions on which Plaintiff's address was used on

correspondence directed to Defendants.  (*Id.* at Ex. 1, 15).  The remaining evidence shows two instances of misdirected phone calls due to a police officer's use of "American Century" as an abbreviation for Defendants on a police report.  (*Id.* at Ex. 1, 11).  In all, Plaintiff has shown specific proof of only six incidents of purported actual confusion, although the parties have both been in business for approximately 10 years.  (Response at 10; Motion at 8). (Motion at Ex. 1 and 4; Response at Ex. 1 and 2).  In light of this, Defendants argue that six incidents within a 10-year period is minimal so that this factor ought not to weigh in Plaintiff's favor.  (Response at 10-12).  *See Elvis Presley Enters.*, 141 F.3d at 204.  However, these incidents nevertheless show that actual confusion has occurred.  Further, Defendants' argument ignores that, in their deposition testimony, Plaintiff's employees stated that they had received additional telephone calls from "confused" customers, although they could not recall the incidents in detail.  (Motion at Ex. 13 and 14).  It is clear, then, that Plaintiff has provided sufficient evidence to show that the final factor in the "likelihood of confusion" test weighs in its favor.

As a general rule, if the "likelihood of confusion" test "is closely balanced, the question should be resolved in favor of the senior user."  *Quantum Fitness Corp.*, 83 F. Supp. 2d at 822.  Here, however, Plaintiff has not shown that the "digits of confusion" are "closely balanced," let alone that the majority of them weighs in its favor.  *See id.*  It clearly cannot be said, then, that a likelihood of confusion exists as a matter of law.  *See Lyons P'ship*, 179 F.3d at 388-90; *Elvis Presley Enters.*, 141 F.3d at 194; *Moore Bus. Forms, Inc.*, 960 F.2d at 490.  Because Plaintiff cannot prevail on its claims without demonstrating a "likelihood of confusion," and it has failed to do so, summary judgment on Claims I, II, and V is not warranted.  *See Westchester Media*, 214 F.3d at 663-64 & n.1.

18

***Claim IV***

Plaintiff also seeks summary judgment on Claim IV, arguing that Defendants' actions dilute Plaintiff's AMERICAN CENTURY trademark in violation of the Texas Anti-Dilution Statute. *See* TEX. BUS. & COM. CODE § 16.29. The relevant portion of the statute states the following:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services.

*Id*. To succeed under the statute, the plaintiff "must show that it owns a distinctive mark and that there is a likelihood of dilution." *E. & J. Gallo Winery v. Spider Webs Ltd*., 286 F.3d 270, 278 (5th Cir. 2002); *accord Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 811 (Tex. App.—Austin 2001, pet. denied). "Dilution involves the gradual 'whittling away' of a party's distinctive mark through unauthorized use by another." *Id.* at 812. "Even in the absence of consumer confusion, an unauthorized user's adoption of another's mark lessens that mark's capacity to identify the true owner's goods and services." *Id.*; *see Scott Fetzer Co.*, 381 F.3d at 488.

"The owner of a distinctive mark or trade name may obtain relief under section 16.29 if there is a likelihood of dilution due to either 'blurring' or 'tarnishing.'" *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899  (Tex. App.—Dallas 2001, no pet.) (citing *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1081 (5th Cir. 1997)); *accord Scott Fetzer Co.*, 381 F.3d at 489; *E. & J. Gallo Winery*, 286 F.3d at 279. "'Blurring' is a diminution in the uniqueness and individuality of a mark or trade name." *Express One Int'l, Inc*., 53 S.W.3d at 899; *accord Exxon Corp.*, 109 F.3d at 1081. "A trade name may be 'tarnished' from another's use of it in a manner that tarnishes or appropriates the goodwill and reputation associated with the name." *Express One Int'l, Inc.*, 53 S.W.3d at 899; *accord Scott Fetzer Co.*, 381 F.3d at 489; *Exxon Corp.*, 109 F.3d at 1081.

19

In this case, Plaintiff owns the "AMERICAN CENTURY" mark, the mark is arbitrary, and it is "distinctive" for purposes of the Lanham Act. (*See* Response at 6; *and see supra*). However, the Fifth Circuit has recognized that "'a somewhat stricter standard is to be applied in determining "strength" in dilution analysis than in likelihood of confusion analysis.'" *Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car Co.*, 238 F.3d 378, 381 (5th Cir. 2001) (quoting *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1565 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998)). Under the Texas Anti-Dilution Statute, to determine whether a mark is "strong" or "distinctive" enough for dilution, the court considers factors such as "whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation." *Id.* (citing *Pebble Beach Co*., 942 F. Supp. at 1565). Here, Plaintiff and Defendants have been utilizing marks that include the words "American Century" for approximately the same amount of time—more than 10 years. (Motion at Ex. 1 and 4; Response at Ex. 1 and 2). And there are clear fact issues as to whether there is significant commonality in the nature and reach of the parties' advertising and promotions. In addition, Plaintiff has submitted no evidence that there is any overlap, to date, in the nature of the parties' businesses. For these reasons, it is evident that genuine issues of material fact remain on whether Plaintiff's mark has achieved the level of distinctiveness required for protection under the Texas Anti-Dilution Statute. *See Advantage Rent-A-Car, Inc.*, 238 F.3d at 381.

Moreover, even if Plaintiff's mark were found to be "distinctive," it is unclear whether Plaintiff could show that a "likelihood of dilution" exists as a matter of law. *See E. & J. Gallo Winery*, 286 F.3d at 278. In its motion, Plaintiff does not argue that Defendants might tarnish its mark, but only that they are likely to "blur" it. (Motion at 28). In support of this claim, Plaintiff makes only two arguments. First, Plaintiff points to evidence that "[t]he parties are unaware of any

20

third party users of 'AMERICAN CENTURY' in connection with insurance or financial services." (*Id.* at 28 and Ex. 1, 4). But this fact, alone, is not enough to justify a finding in Plaintiff's favor. *See Exxon Corp.*, 109 F.3d at 1081; *Express One Int'l, Inc.*, 53 S.W.3d at 899. Second, Plaintiff argues that "the distinguishing portions of Defendants' marks are identical to Plaintiff's mark." (Motion at 28). As discussed above, however, there is a fact issue on the degree of similarity among the parties' marks. On this summary judgment record, it would be difficult to determine whether, in fact, Defendants' use of the words "American Century" is likely to result in "a diminution in the uniqueness and individuality of" Plaintiff's mark. *See Exxon Corp.*, 109 F.3d at 1081; *Express One Int'l, Inc.*, 53 S.W.3d at 899. Here, then, there are genuine issues of material fact as to whether Defendants are liable for dilution under Texas law, which precludes summary judgment on Plaintiff's Claim IV.

For the reasons detailed above, there are genuine issues of material fact on whether Defendants are liable to Plaintiff for Claims I, II, IV, and V. Where genuine issues of material fact remain, summary judgment is not available. *See* FED. R. CIV. P. 56(c); *Taita Chem. Co.*, 246 F.3d at 385. Instead, the issues are appropriate for trial. *See Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075); *Izen*, 398 F.3d at 366; *Taita Chem. Co.*, 246 F.3d at 385.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment as to Claims I, II, IV, and V be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the

time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 12th day of April, 2007.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**